UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Stark & Knoll Co., L.P.A.,** | ) | **CASE NO. 12 CV 2669** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **ProAssurance Casualty Co.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant ProAssurance Casualty Company's Motion to Dismiss with Prejudice (Doc. 11). Also pending is Plaintiff's Motion for Summary Judgment as to Counts One and Two of the Complaint (Doc. 13). This is an insurance coverage dispute. For the reasons that follow, defendant's motion to dismiss is GRANTED in PART and DENIED in PART. Count three is dismissed, but counts one and two remain pending. Plaintiff's motion for summary judgment is DENIED as other issues must be addressed in order to fully resolve the claims.

1

**FACTS**

Plaintiff, Stark & Knoll Co., LPA, brings this lawsuit against defendant, Prossurance Casualty Company, alleging that defendant wrongfully denied insurance coverage under plaintiff's malpractice insurance policy.

The facts of this case are undisputed.

Sometime prior to June 15, 2012, James L. Rench, an attorney employed by plaintiff, received an email purportedly from an attorney located in Idaho. The email asked whether Rench would be able to accept a collection matter on behalf of a client located in Germany. Rench indicated he would accept the referral, subject to a conflict of interest check and certain other matters. Rench was advised to contact the German client directly.

Thereafter, on June 18, 2012, Rench received an email from a "Mathis Traugott" of ZeligSteel AG, in Krefeld, Germany. Traugott detailed the nature of the collection action and advised Rench that the account debtor was Rable Machine, Inc., located in Ohio. A conflict of interest check was run, and the matter was cleared of conflicts. Rench sent Traugott an engagement letter, which Traugott signed.

On July 9, 2012, Rench received an email from Traugott, which contained a copy of a Sales Agreement purportedly between ZeligSteel and Rable Machine. In addition, Traugott advised Rench that Rable would be forwarding a partial payment on the account to Rench's attention. On July 17, 2012, Rench received by UPS overnight mail an envelope containing an "Official Check of CitiBank, N.A." in the amount of $295,960.00, payable to plaintiff. Rench advised Traugott that the check would be deposited in the firm's IOLTA account with FirstMerit Bank and that Rench would await further instructions. Rench also emailed a receipt to Rable

2

Machine indicating that the check had been received.

The following day, Rench received wiring instructions from Traugott directing that $197,921.00 be wired to "Full House Trading Co. Japan's account at the Johuku Shinkin Bank." Rench instructed the firm's administrator to coordinate the wire transfer with FirstMerit Bank.

On July 19, 2012, Rench received additional wiring instructions directing Rench to wire another $65,750.00 to be transferred to the Japanese bank. Rench again conveyed the instructions to the firm's administrator. Later that day, FirstMerit contacted plaintiff and informed it that the check from Rable Machine was returned and marked "unable to locate account." FirstMerit further advised plaintiff that the check was a forgery. FirstMerit was able to stop the $67,500 wire, but the $197,921.00 wire had already been sent.

That same day, Rench learned that the attorney located in Idaho had never requested a referral and, in fact, the attorney believed that a fake email address was set up for his office. Other attorneys previously contacted him regarding purported referrals. Rench also spoke with Rable Machine and was advised that it did not remit a CitiBank check. Rench then reported the matter, commonly referred to as a "phishing" scam, to the police.

On July 20, 2012, plaintiff transferred funds out of its general operating account in order to cover the funds it wired out of its IOLTA account. According to the complaint, the Ohio Rules of Professional Conduct require replenishment of the funds.

On August 14, 2012, plaintiff filed a claim with defendant seeking coverage for the loss under its legal malpractice insurance policy. Plaintiff sent copies of two cases that it claims support the position that coverage is required for the loss.

On September 14, 2012, defendant denied plaintiff's claim and this lawsuit ensued. The

complaint contains three claims for relief.  Count one is a claim seeking a declaratory judgment regarding the parties' rights under the insurance agreement.  Counts two and three assert claims for breach of contract and bad faith, respectively.

Defendant moves to dismiss the complaint.  Plaintiff opposes the motion and moves for summary judgment, which defendant opposes.

## **STANDARDS OF REVIEW**

A.  Dismissal

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff.  *Lawrence v. Chancery Court of Tenn.,* 188 F.3d 687, 691 (6th Cir. 1999). Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.  However, the complaint must set forth "more than the bare assertion of legal conclusions." *Allard v. Weitzman* (*In Re DeLorean Motor Co.*)*,* 991 F.2d 1236, 1240 (6th Cir. 1993).  Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule 12(b)(6) review. *Fingers v. Jackson-Madison County General Hospital District,* 101 F.3d 702 (6th Cir. Nov. 21, 1996), *unpublished*.  Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489-490 (6th Cir. 1990).

In addition, a claimant must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of

4

action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1955 (2009). Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'

*Id.* at 1949 (citations and quotations omitted). *See also, Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603 (6th Cir.2009).

　　B.　　Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing

5

development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### **ANALYSIS**

1. Coverage

Defendant argues that it is entitled to dismissal of the complaint because the plain and unambiguous language in Policy No. LP51865 ("Policy") demonstrates that the "phishing scam" to which plaintiff fell prey is not a covered loss under the Policy, which covers legal malpractice. Plaintiff responds that the Policy clearly and unambiguously covers the loss at issue in this case.

According to the Policy, defendant agreed to cover the following:

...[A]ll sums up to the Limit of Liability...and in excess of the Deductible...which the **Insured** shall become legally obligated to pay as **damages** because of any **claim** or **claims**...involving any act, error or omission in rendering or failing to render **professional services** by the **Insured** or by any person for whose acts, errors, or omissions the **Insured** is legally responsible....

In other words, for coverage to exist, there must be a "claim" for "damages" resulting from the "rendering or failing to render professional services."  Each issue will be addressed in turn.

"Claim" is defined as:

...[A] demand or suit for **damages** received by an **Insured**, including any arbitration proceeding to which the **Insured** is required to submit or to which the insured has submitted with the **Company's** consent.

Plaintiff argues that a "claim" exists in this case as that term is defined in the Policy.

7

Defendant does not directly respond to this argument. Accordingly, the Court finds that this Policy term is satisfied.

The parties dispute whether Rench was engaging in "professional services," as that term is defined. According to defendant, no attorney-client relationship existed between Rench and Traugott (or ZeligSteel) and, therefore, no professional services could have been rendered. In addition, defendant argues that the services performed by Rench on behalf of Traugott included only ministerial actions, none of which required "specialized legal knowledge." In response, plaintiff argues that Rench performed "professional services" with respect to ZeligSteel. Specifically, plaintiff claims that Rench researched the parties' identities, performed a conflict check, drafted an engagement letter, and reviewed the alleged Sales Agreement purportedly between ZeligSteel and Rable Machine. Plaintiff further argues that Rench engaged in the provision of "professional services" with respect to the management of the IOLTA account. According to plaintiff, the Policy covers an attorney acting as a "fiduciary" or "trustee." Thus, actions involved in overseeing the disbursement of client funds fall within this definition. In response to this argument, defendant argues only that if the Court accepts this argument, then the deductible is not met.

"Professional Services" is defined as:

...[S]ervices rendered by an **Insured** as a provider of legal services in a lawyer-client relationship. **Professional Services** shall also include activities of an **Insured** as a mediator, arbitrator...administrator, conservator, receiver...trustee...or in any similar fiduciary capacity....

Upon review, the Court finds that Rench engaged in the provision of "professional services." The Court finds that the arguments made by defendant regarding whether Rench acted as an attorney *vis à vis* Traugott or ZeligSteel are off point. Rather, under these circumstances,

8

the claim that would be made against the law firm for which it would seek coverage would be made by existing clients whose funds were improperly disposed of by Rench.  Based on the language in the Policy, which includes actions taken as a "trustee" or in a "similar fiduciary capacity,"  the Court finds that plaintiff provided "professional services" as that term is defined in the Policy.  *See, Nardella Chong v. Medmarc Casualty Ins Co.*, 642 F.3d 941, 942 (11th Cir. 2011)(reversing district court's decision and holding that the management of client funds constitutes "professional services" where policy definition includes actions taken as "trustee" or "similar fiduciary capacity").

The Court now turns to whether the Policy definition of "damages" is satisfied in this case.

"Damages," is defined as:

...monetary judgments, awards, and settlements, but does not include the return or restitution of legal fees, costs and expenses charged by the **Insured**, or any allegedly misappropriated client funds or interest thereon.

Defendant argues that the monies taken from the IOLTA account were "misappropriated" and, as such, they do not meet the definition of "damages" contained in the Policy.  Defendant argues that "misappropriate" does not require that Rench intended to defraud the clients.  Rather, according to defendant, Rench misappropriated client funds by improperly removing funds and wiring them overseas.  Defendant argues that the Ohio ethics laws impose a duty on attorneys to safeguard client funds and, regardless of whether the act is accidental or intentional, the mishandling of client funds amounts to misappropriation.  Alternatively, even if Rench did not "misappropriate" client funds, there can be no argument that the client funds themselves were misappropriated as a result of the fraudulent scheme.  Because the language in the Policy

9

precludes coverage for "*any* allegedly misappropriated client funds," the loss is not covered.

On the other hand, plaintiff argues that the ordinary meaning of "misappropriation," as defined in Black's Law dictionary is "[t]he application of another's property or money *dishonestly* to one's own use." (Black's Law Dictionary, 9th Ed.) According to plaintiff, Rench did not act dishonestly. Moreover, the Policy should not prevent coverage as a result of acts taken by third parties. As such, even if an overseas third-party could "misappropriate" client funds, the Policy does not contain specific language excluding coverage for third-party acts.

"The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (*citing Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)). Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement. *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999). "[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted." *Id*. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). Under Ohio law, common words appearing in the contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id*. (internal quotation and citation omitted).

As an initial matter, the Court finds that the word "misappropriate," which is not defined in the Policy, is ambiguous. In support of its position, defendant relies on the Black's Law

10

Dictionary definition of "appropriation," which means the "exercise of control over property." Defendant further argues that the phrase "misappropriate" means to "apply wrongly." Therefore, according to defendant, the plain and ordinary meaning of "misappropriation" is the "wrongful exercise of control over property." As plaintiff points out, however, defendant wholly ignores the Black's Law Dictionary definition of "misappropriation," which is defined as "[t]he application of another's property or money *dishonestly* to one's own use." Because it is not clear whether the word "misappropriation" as used in the Policy requires a dishonest act–as opposed to a negligent act–the Court finds that under well-settled law, the phrase must be construed against the insurer. Accordingly, the Court finds that in order to fall outside the definition of "damages," the "misappropriator" must have acted dishonestly.

Defendant next argues that even if "misappropriation" is defined to require a dishonest act, the Policy clearly and unambiguously provides that "damages" does not include "*any* allegedly misappropriated client funds." According to defendant, all words in the Policy must be afforded some meaning. Here, according to defendant, "any" means precisely what it suggests–that *any* alleged misappropriation of funds is not considered "damages." Defendant argues that it cannot be disputed that the funds at issue were misappropriated by the overseas third-party. Thus, because a "misappropriation" of funds occurred, the Policy does not cover the loss.

On the other hand, plaintiff argues that where an insurer seeks to exclude coverage based on the acts of a third-party, the policy must specifically so state. Similarly, because the language can be interpreted two ways, it is ambiguous and must be construed against defendant. Plaintiff also argues that all of the language in the definition of "damages" relates to the insured. Thus,

11

the Court must presume that the phrase "misappropriation of client funds" also relates to the insured.  Plaintiff further claims that the word "client" modifies "funds" and because the overseas third-party actor has no "clients," he could not misappropriate "client" funds.

The Court finds plaintiff's citation to *Westport Ins. Corp. v. Energy Fin. Services*, 2007 WL 4365373 (W.D.Ky. Dec. 11, 2007), *aff'd*, 2009 WL 775881 (6th Cir. March 24, 2009) particularly instructive.  In *Westport*, the insured was hired to administer health insurance on behalf of a client.  In so doing, the insured recommended that its client utilize the services of a third-party claims administrator.  Ultimately, the third-party co-mingled funds and was unable to pay the health insurance claims.  The insured was sued by its client for negligently recommending the third-party claims administrator.  The insurer denied coverage on the grounds that the policy at issue foreclosed coverage for "any claim...arising out of...the conversion [or] misappropriation of client funds...."  According to the district court, Kentucky law provides that, "where an insurance company intends an exclusion to exclude coverage in situations that arise due to the acts of a third-party, and not the insured, the insurance company has a duty to explicitly so provide."  *Id*. at *5.  The court concluded that because the clause did not "tell[] the agent that there will be no coverage for negligence even if [it] is a third-party that commingles funds or causes the insolvency, irrespective of whether the agent had anything to do with it or not," the language was ambiguous and therefore, must be construed against the insurance company.  *See also, HR Knowledge, Inc. v. Professional Ins. & Risk Brokerage, LLC*, 888 N.E.2d 385 (Ct. App. Mass. 2008).

Although the court in *Westport* interpreted Kentucky law, defendant does not indicate

12

that Ohio would adopt a different view.[1] This is especially so given that the basic tenants of insurance contract interpretation appear to be the same. Although a close call, the Court finds that the language at issue is ambiguous. On the one hand, a reasonable reading of the language indicates that "any" appropriation, including one by a third-party, is not a covered "damage." That reading, however, is not the only reasonable reading of the definition. The Court agrees with plaintiff that all of the other language in the phrase is directed at the insured. Further, plaintiff correctly notes that a third-party cannot "misappropriate" *client* funds, as the third-party has no clients. On the whole, the Court cannot say that this reading of the provision is incorrect. As such, the Court construes the language against defendant and finds that the acts of the overseas third-party do not preclude coverage.

Defendant next argues that coverage is not available because the "deductible" for "each claim" is not satisfied. Defendant relies on the following Policy provision:

5.1 Limit of Liability–Each Claim

---

[1] The Court notes that defendant relies on an Ohio case discussing an "assault and battery" exclusion. *See, Colter v. Spanky's Doll House*, 2006 WL 235045 (Ohio Ct. App. Jan. 27, 2006). In that case, the court held that an exclusion that excepted coverage for "any assault and battery" prevented coverage for injuries sustained by a patron that were caused by another patron. On the other hand, policy language excepting "the actual or threatened assault or battery or the failure to suppress or prevent such action by the insured or by anyone else for whom the insured is legally responsible" has been held in Ohio to be ambiguous. *See, Lock v. Oney's Pub*, 1996 WL 648357 (Ohio Ct. App. Nov. 8, 1996). Although these cases are not directly on point, it appears that both stand for the proposition that this Court must carefully review the precise nature of the language in order to determine whether it is ambiguous.

> The Each Claim limit in Item 4 of the Declarations is the most the Company will pay for the sum of all damages and claim expenses involving a single act, error or omission or a series of related acts, errors or omissions, regardless of the number of claims made or the number of Insureds involved in the claim(s) or the number of persons or entities making the claim(s).

(Emphasis omitted).

> 5.4 Deductible
>
> The Deductible amounts shown in Item 5 of the Declarations apply to each claim and in the Aggregate for the policy period and shall be paid by the Named Insured. The Per Claim Deductible applies to the sum of all damages and claim expenses.... The Aggregate Deductible is the most the Insured shall pay for the sum of all damages and claims expenses for all claims first made and reported to the Company during the policy period....

(Emphasis omitted).

According to defendant, the "each claim" deductible is $25,000. Because each client who had money in the firm's IOLTA account had a "claim" against plaintiff, and because the firm held money in its IOLTA account for 51 clients, no coverage is available.[2]

In response, plaintiff argues that the Policy is ambiguous. According to plaintiff, the Declarations page shows that the "per claim" deductible is $25,000, but the "aggregate deductible" is listed as $0. Plaintiff argues that these two figures cannot be reconciled. Because the Policy provides that the "most the Insured shall pay" is $0, plaintiff cannot at the same time pay $25,000 per claim. Plaintiff further argues that if the Court is able to reconcile the language such that plaintiff is responsible for paying a per claim deductible of $25,000, the nature of the situation requires that the deductible apply only once. Plaintiff argues that the Court should

---

[2] In other words, defendant would only provide coverage if the damages totaled more than $1,275,000, *i.e.*, the $25,000 per claim deductible multiplied by 51 (the number of "claims").

14

reject defendant's position that each client would file a lawsuit against defendant seeking money from the IOLTA account. According to plaintiff, at least one client had funds in the IOLTA account totaling well over the amount the firm seeks to recover. Since it is possible that this client may be paid last out of the existing funds, the deductible would apply only once.

Upon review, the Court finds that the Policy language is ambiguous as to whether a "per claim" deductible applies. Although the Court recognizes that the Policy appears to provide as such, the language simply cannot be reconciled in any cogent way with an "aggregate deductible" of $0. The Policy expressly states that the "most the insured shall pay" is $0. Because the Policy is ambiguous, the Court will construe it against defendant. As such, no deductible applies and the Court need not reach the parties' remaining arguments regarding how to apply the "per claim" deductible.

Having concluded that the Policy affords coverage provided that Rench did not act dishonestly in connection with the phishing scam, defendant's motion to dismiss must be denied as to counts one and two. The Court, however, concludes that summary judgment is not appropriate at this time. Defendant argues that "questions of fact" exist as to whether Rench acted dishonestly. Although not specifically so requesting, the Court will liberally construe defendant's arguments regarding "questions of fact" to mean that discovery may assist in resolving these issues. Because discovery is not set to close for five months, the Court finds that summary judgment is not appropriate at this time.

2. Bad faith

Defendant argues that its decision to deny coverage was correct and, therefore, the bad faith claim fails. Defendant further argues that it did not act "arbitrarily or capriciously" in

15

denying plaintiff's claim for coverage. Plaintiff responds that there is coverage here and defendant acted improperly in denying the claim. Plaintiff points out that it provided defendant with case law establishing that the claim is covered in this case.

Under Ohio law, "an insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, syllabus ¶ 1 (Ohio 1983). "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, syllabus ¶ 1 (Ohio 1994). The inquiry under this standard is whether "the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial," not whether the insurance company's decision to deny benefits was correct. *Rauh Rubber, Inc. v. Berkshire Life Ins. Co.*, 1999 WL 1253062 (6th Cir. Dec. 16, 1999) (citing *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir.1992)); *see also Hart v. Republic Mut. Ins. Co.,* 87 N.E.2d 347, 349 (Ohio 1949). "Where a claim is fairly debatable, the insurer is entitled to refuse the claim as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Tokles & Son, Inc. v. Midwestern Indemnity Co.*, 65 Ohio St.3d 621, 630 (Ohio 1992). "As part of its duty, the insurer must 'assess claims after an appropriate and careful investigation' and reach conclusions as a result of 'the weighing of probabilities in a fair and honest way.'" *Dorsey v. Campbell Hauling*, 2003 WL 21469132 at *4 (Ohio Ct. App. 10th Dist. June 26, 2003) *citing Motorist Mut. Ins. Co. v. Said*, 590 N.E.2d 1228 (Ohio 1992), *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397 (Ohio 1995).

Upon review, the Court finds that dismissal of the bad faith claim is warranted. As an initial matter, the case law cited by plaintiff and provided to defendant is not directly on point. Rather, the primary dispute in this case centers on whether the "damages" provision is satisfied. However, neither *Nardella Chong v. Medmarc Casualty Ins Co.*, 642 F.3d 941, 942 (11th Cir. 2011) nor *O'Brien & Wolf, LLP v. Liberty Ins. Underwriters, Inc.*, 2012 WL 3156802 (D. Minn. Aug. 3, 2012), involved the damages provision at issue in this case. Moreover, the Court finds the issue of whether the damages provision is satisfied to be a close call. Accordingly, because the decision was "reasonably debatable" and because plaintiff alleges no additional facts on which the claim could be based, defendant is entitled to dismissal of count three.

**CONCLUSION**

For the foregoing reasons, the defendant's motion to dismiss is GRANTED in PART and DENIED in PART. Count three is dismissed, but counts one and two remain pending. Plaintiff's motion for summary judgment is DENIED as other issues remain pending for a resolution of the claims.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 4/8/13